J-S26029-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DALE L. & LINDY L. VARNER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| FELICITY DAWN HOCKER, DECEASED, AND DANIELLE HOCKER | : | No. 453 MDA 2022 |
| APPEAL OF: DANIELLE HOCKER, | : | |
| Intervenor | : | |

Appeal from the Order Entered February 14, 2022
In the Court of Common Pleas of Huntingdon County Civil Division at
No(s):  CP-31-CV-235-2021

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.:         **FILED: SEPTEMBER 29, 2022**

Intervenor, Danielle Hocker (Appellant), files this appeal from the order dated and entered February 14, 2022, in the Huntington County Court of Common Pleas, with respect to custody of the male child, C.J.H. (Child), born in January 2021.  The order awarded sole legal and physical custody to Dale L. Varner (Dale) and Lindy L. Varner (Lindy) (collectively, Appellees).  The order further granted Appellant two non-overnight visits per year in Huntington County, Pennsylvania.  After review, we affirm the trial court's order.

_____

[*] Former Justice specially assigned to the Superior Court.

This matter arises from a tragic incident in which Felicity Dawn Hocker (Mother) was struck and killed by a freight train in Northumberland County, Pennsylvania, in March 2021, at 21 years old. N.T., 2/11/22, at 6. Mother had given birth to Child approximately two months prior to her death. *Id.* at 3. Child's biological father is unknown.

Appellant is the sister of Mother's father, and, therefore, Child's maternal great-aunt. N.T., 8/20/21, at 5-6, 51-52. Appellees are the half-sister and brother-in-law of Mother's mother, and, therefore, also Child's maternal great-aunt and great-uncle. N.T., 2/11/22, at 3, 33-34; N.T., 8/20/21, at 6. Appellant and Appellees were not aware of each other and never met prior to the present litigation. N.T., 2/11/22, at 14, 33, 38, 40; N.T., 8/20/21, at 6.

The trial court set forth the following background regarding Mother's familial relationships and upbringing.

> [Mother] was born [in] 1999. She lived with her sister [ ] and their parents [ ] in Florida for a time. At some point in or around 2001 or 2002 the family moved to Huntingdon County, Pennsylvania. . . . This was the first time that Lindy met [Mother], and was the first time that Lindy met [Mother's mother] as well — Lindy had not even known that she had [a half-]sister prior to this point.
>
> The family's time in Pennsylvania was a turning point for [Mother]. While the precise details are unknown, [Mother's parents] lost custody of both [Mother] and [her sister] in 2002, apparently after the girls were found locked in the trunk of a car. [Mother's grandparents] took custody of [Mother], and at three years of age, she went to live with them in [the State of] Washington. [Mother's father] returned to Florida, where he still

lives, and [Mother's mother] now lives in Altoona, Blair County, Pennsylvania.

[Appellant], then age twenty-three, was not living at home when [Mother] came to live with [her grandparents, who are Appellant's parents]. She was living nearby, and was involved in [Mother]'s life as her aunt. [Appellant] saw [Mother] more frequently during [Mother]'s first two years in Washington. Their interactions became more infrequent around the time that [Mother] was five because: (i) [Appellant] became quite busy, attending college while continuing to work full-time; and (ii) the relationship between [Appellant] and [her father] became strained. . . . It was also around this time that [Appellant] moved to Colorado.

[Mother's grandparents] and [Mother] continued to live in Bremerton, Washington, until [Mother] was in her early teens, at which point [Mother's grandfather] retired and the family moved to Colorado as well. [Appellant] visited [Mother] while they were both living in Colorado, and then moved back to Bremerton when [Mother] was fourteen or fifteen. [Appellant] had minimal contact with [Mother] for the next few years, until after [Mother] turned eighteen and was no longer living with [her grandparents].

. . . Per [Mother's grandfather]'s testimony, [Mother] was diagnosed with bipolar disorder at age sixteen. This led to a lot of friction between her and her grandparents, and at age seventeen she was placed in [a Christian] girls' home in Colorado Springs, Colorado. When [Mother] turned eighteen the supervisor of the home sent [Mother] to a similar facility for adults in Corpus Christi, Texas. This move occurred at a time in which [Mother] was apparently avoiding contact with [her grandfather] (who testified that the move occurred without his knowledge), but did have some contact with [Appellant], as [Appellant] was contacted as being a possible resource for [Mother]. Regardless, after spending a few months in Texas, [Mother] got in touch with [Appellant]. In December 2017[, Appellant] bought a bus ticket for [Mother] to travel to Washington. [Mother] stayed with [Appellant] in Bremerton for about a week, until [Appellant] caught her in a lie regarding her claimed plan to earn her GED and get a job. [Mother] then moved to Pennsylvania.

Trial Ct. Op., 4/28/22, at 3-5 (footnotes omitted).

Upon her return to Pennsylvania, Mother again visited with and commenced a relationship with Lindy and extended family in Pennsylvania. N.T., 2/11/22 at 6, 31-32, 66-67, 74. Over the next few years, before her untimely death, Mother maintained occasional contact with Appellant, Lindy, as well as her grandfather, among other family. N.T., 2/11/22, at 32, 66-67, 74-75; N.T., 8/20/21 at 18-20, 55. Both Appellant and Lindy knew of Mother's pregnancy, and Mother sought Lindy's advice regarding same.[1] N.T., 2/11/22, at 4; N.T., 8/20/21, at 18. Appellant last spoke to Mother just prior to Child's birth. N.T., 8/20/21, at 19-20. Noting that Mother had been "struggling" and was "busy making sure [Child] was okay," Appellant was aware Child had been born but confirmed that she had not received any communication from Mother after Child's birth. *Id.* at 19-20, 40. Lindy indicated that her last contact with Mother involved Mother sending her a picture following Child's birth. N.T., 2/11/22, at 3, 31.

Two days after Mother's death, in the early morning hours of March 3, 2021, Northumberland County Children and Youth Services (CYS) placed Child with Appellees, who reside in Huntingdon County, Pennsylvania.[2] N.T., 2/11/22, at 7-8. Child has remained in Appellees primary custody since this

---

[1] Lindy testified, "I knew she was pregnant and how she got pregnant. Then she asked me what to do." N.T., 2/11/22, at 4.

[2] Lindy testified that, after discussions between her, her sister, and her mother, Child was placed with her and her husband at approximately midnight on March 3, 2021. N.T., 2/11/22, at 7-8, 31, 35-37, 65-66. Initially, it was thought the placement was to be temporary. *Id.* at 36-37, 65-66.

time. On March 11, 2021, Appellees filed an emergency custody complaint for the purpose of obtaining legal authority to treat Child's medical problems. *Id.* at 13-14. Specifically, at the time of placement, Child was "severely malnourished, underweight, [and] dehydrated." N.T., 2/11/22, at 10. Additionally, as Lindy explained, Child has kidney issues, potential vision issues, and is being monitored for autism as a result of a genetic disorder. *Id.* at 12-13, 26. He also has orthopedic issues and gastro-intestinal issues. *Id.* at 13, 18. As a result, Child sees various medical specialists. *Id.* at 12-13, 26. Lastly, Child receives early intervention services due to developmental delays. *Id.* at 24. Lindy described these services as physical therapy and indicated that Child may also be referred for speech therapy. *Id.* at 24-25.

In the meantime, after learning of Mother's death from her father, Appellant, who resides in Washington, contacted the police in Pennsylvania seeking information as to Child's whereabouts and care. The police then put Appellant in touch with CYS. N.T., 8/20/21, at 19-20. After locating Child, Appellant filed a petition to intervene in the underlying custody matter on April 12, 2021, wherein she also requested legal and physical custody.[3] *See* Appellant's Petition to Intervene, 4/12/21, at 1-4 (unpaginated).

---

[3] Appellant testified that she did not know how to contact Appellees. N.T., 8/20/21, at 20-21, 41.

The trial court conducted a hearing on May 27, 2021, on both petitions.[4] By order entered that same day, the court granted Appellant's request to intervene, and awarded the parties shared legal custody and Appellees primary physical custody. *See* Order, 5/27/21. Despite the award of shared legal custody, the court provided that Appellees may make medical decisions without Appellant's consent. *See id.* The court further scheduled a hearing regarding the custody factors. *See id.* Around this time, Appellant had her only in-person visit with Child prior to the conclusion of the custody hearings.[5] N.T., 2/11/22, at 16-17; N.T., 8/20/21, at 33.

The trial court conducted custody hearings on August 20, 2021, and February 11, 2022. At the conclusion of the hearings, Child was approximately thirteen months old. Both Appellant and Appellees were present and represented by counsel.[6] On August 20, 2021, Appellant presented her testimony and that of her common-law husband, M.B. Appellees presented the testimony of Mother's grandfather, R.H. On February 11, 2022, Appellees both testified on their own behalf and presented the testimony of Lindy's half-

---

[4] A transcript of the May 27, 2021, hearing is not included in the certified record.

[5] Appellant met Appellees and Child at an Ollie's store for about two hours. N.T., 2/11/22, at 16-17; N.T., 8/20/21, at 33.

[6] Appellant participated in the February 11, 2022, hearing *via* Zoom. N.T., 2/11/22, at 1.

sister, L.C. Notably, both Appellant and Appellees expressed their ultimate desire to adopt Child. N.T., 2/11/22, at 29-30, 62; N.T., 8/20/21, at 30.

By order dated and entered February 14, 2022, the trial court awarded Appellees sole legal and physical custody. Finding visitation with Appellant "not feasible," the court further directed Appellees to provide Appellant regular updates regarding Child and granted Appellant non-overnight visits with Child twice each year in Huntingdon County with thirty days advance notice.[7] Critical to the court in its determination was "the distance between the parties, the limited resources of the parties for travel, the child's young age, and the child's medical needs." Trial Ct. Op. at 1.

Thereafter, on March 14, 2022, Appellant filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court then issued a Rule 1925(a) opinion on April 28, 2022, in which it explained:

> Review of the record shows that this case, which arose out of a particularly tragic set of circumstances, presented the [c]ourt with an unenviable scenario. Because of the distance between the parties, the limited resources of the parties for travel, the child's young age, and the child's medical needs, shared custody is not

---

[7] We observe that the Child Custody Act ("the Act"), 23 Pa.C.S. §§ 5321-5340, does not provide for an award of visitation. **See** 23 Pa.C.S. § 5323(a). Rather, the Act provides for "[p]artial physical custody," defined as "[t]he right to assume physical custody of the child for less than a majority of the time. 23 Pa.C.S. § 5322(a). With the trial court's disposition, we therefore identify the award of custodial time to Appellant, however limited, as that of partial physical custody.

an option at this time. Similar considerations also preclude an arrangement that would provide for extensive in-person visitation. Thus, the custody decision to be made by the [c]ourt was, by necessity, a binary choice, and the granting of custody to one of the households seeking to raise [Child] would significantly limit the involvement of the other. With the best interests of [Child], serving as the lodestar, it is readily apparent that keeping [Child] in his current home with [Appellees] is the right outcome here[.]

Trial Ct. Op. at 1.

On appeal, Appellant raises the following issues for our review:

1. Whether the [t]rial [c]ourt erred and/or abused its discretion in awarding sole legal and physical custody of [Child] to the Appellees under all the facts and circumstances of this case and the law applicable thereto[?]

2. Whether the [t]rial [c]ourt erred and/or abused its discretion in awarding sole legal and physical custody of [Child] to the Appellees as the Appellant has standing relating to the minor child and the [t]rial [c]ourt only provided for limited visits with Appellant[?]

3. Whether the [t]rial [c]ourt erred and/or abused its discretion in failing to consider and appropriately weigh all the factors set forth in 23 [Pa.C.S. § 5328(a)] including but not limited to the consanguinity relationship between Appellant and Defendant/Biological Mother of [Child] in awarding sole legal and physical custody to Appellees[?]

4. Whether the [t]rial [c]ourt in awarding sole legal and physical custody to the Appellees erred and/or abused its direction in finding that Appellant could only see the child twice a year with no overnight visits[?]

Appellant's Brief at 4.[8]

---

[8] We note that Appellant listed a fifth issue in her concise statement in which she challenged the trial court's determination that "visitation with Intervenor was not feasible." **See** Appellant's Concise Statement of Errors Complained of on Appeal, 5/14/22, at 2 (unpaginated). However, she asserts in her brief that she "combine[d] matters (4) and five (5) . . . into one overarching argument concerning[.]" Appellant's Brief at 34.

In custody cases under the Act, our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F. v. S.E.F.***, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted); ***see***

***also E.R. v. J.N.B.***, 129 A.3d 521, 527 (Pa. Super. 2015).

This Court has consistently held:

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

In addition,

[a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

***M.A.T. v. G.S.T.***, 989 A.2d 11, 18-19 (Pa. Super. 2010) (*en banc*) (citations

omitted).

The paramount concern in any custody case decided under the Act is the best interests of the child. *See* 23 Pa.C.S. §§ 5328, 5338. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted). Section 5328(a) sets forth the best interest factors that the trial court must consider in awarding custody.[9] *See E.D. v. M.P.*, 33 A.3d 73, 79-80 n.2 (Pa. Super. 2011). Section 5328(a) of the Act provides as follows:

### § 5328. Factors to consider when awarding custody

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

---

[9] We note that as between two non-parent, third parties, there is no presumption favoring one party over another. 23 Pa.C.S. § 5327(c) (providing, "In any action regarding the custody of the child between a nonparent and another nonparent, there shall be no presumption that custody should be awarded to a particular party.").

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Further, with regard to the Custody Act, we emphasized:

"**All** of the factors listed in [S]ection 5328(a) are required to be considered by the trial court when entering a custody order." The record must be clear on appeal that the trial court considered all the factors.

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S. § 5323(d). Additionally, "[S]ection 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a) custody] factors prior to the deadline by which a litigant must file a notice of appeal." . . .

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d).

*A.V. v. S.T.*, 87 A.3d 818, 822-23 (Pa. Super. 2014) (some citations omitted; emphasis in original).

With regard to the custody factors, we have emphasized that the trial court is required to consider all such factors. *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011). While the court is required to give weighted consideration to factors affecting the safety of the child pursuant to 23 Pa.C.S. § 5328(a), the amount of weight a court gives any one factor is almost entirely discretionary. *M.J.M. v. M.L.G.,* 63 A.3d 331, 339 (Pa. Super. 2013). Critically, as we stated in *M.J.M.*: "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." (citation omitted).

- 12 -

In the instant matter, the trial court addressed and analyzed the best interest factors pursuant to Section 5328(a).[10]  Trial Ct. Op. at 12-24.  The court found that the factors in Section 5328(a)(2), (2.1), (6), (7), (8), (14), and (15) were not applicable; the factors in Section 5328(a)(3), (5), (9), (10), and (12) were neutral; and the factors in Section 5328(a)(1), (4), (11), (13), and (16) favored Appellees.

In her first and third issues, which we review together, Appellant disputes the trial court's analysis as to the best interest factors.  Appellant's Brief at 12, 30.  Specifically, Appellant challenges the trial court's analysis regarding the Section 5328(a)(1), (4), (11), (13), and (16) factors, which the court found favored Appellees.  *Id.* at 12.  As to these factors, the court opined:

> 1. <u>Which party is more likely to encourage and permit frequent and continuing contact between the child and another party</u>.  At the [February 11, 2022, hearing,] the [c]ourt noted that its primary concern with respect to this factor was crafting a visitation

---

[10] We note the trial court did not render a decision on the record at the conclusion of the February 11, 2022, hearing.  While the trial court addressed the Section 5328(a) best interest factors in a cursory fashion at the conclusion of the hearing, *see* N.T., 2/11/22, at 77-81, the court failed to reference and/or include this or any discussion related to the factors and its reasoning with its February 14th order.  Rather, the court provided a full analysis of the Section 5328(a) best interest factors, on which it based its order, in its Rule 1925(a) Opinion.  Because Appellant does not assert error or claim prejudice, we do not address this issue.  We remind the court, however, of the necessity to abide by the case law interpreting Section 5323(d).  *See A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014) (emphasizing Section 5323(d) requires trial court to "delineate the reasons for its decision on the record . . . or in a written opinion and order . . . prior to the deadline" for filing appeal).

schedule that would work for the parties, in light of the distance between them, their limited resources for travel, and [Child]'s specialized needs. The [c]ourt believed that the relationship between the parties was a secondary consideration, because there was not a concern that either of the parties would "stonewall" the other.

Upon further review of the record and consideration of the evidence presented, the [c]ourt finds that this factor weighs in favor of [Appellees], and against [Appellant]. The [c]ourt's basic finding that both sides will "continue to cooperate" regardless of the custody arrangement still holds true, but Lindy is much more willing to foster an open and healthy relationship between [Child] and [Appellant] than [Appellant] is with respect to Lindy and her family.

The most significant factors in this regard are: (i) [Appellant]'s strained relationship with [her father, Mother's grandfather]; and (ii) her implicit belief that her relatives in Pennsylvania are somehow "tainted."

It is clear from the testimony that [Appellant]'s openness to contact with [her father] is a matter of degree, and varies depending on her perception of his actions at any given time. On the whole, she seeks to limit such contact as much as possible. This is in contrast to [her father], who appears to want as much contact with [Appellant] as she will allow, but also seeks to minimize conflict with her and to give her space so that she does not cut off all contact with him. Because [Appellees] have reached out to [Mother's grandfather], have been friendly toward him, and have involved him in [Child]'s life, [Appellant] appears to extend her dislike for [her father] toward them.[11] However, even absent [Appellant]'s feelings toward [her father], it is clear that she views the entirety of her extended family in Pennsylvania with suspicion. Pointedly, [Appellant]'s motives in seeking custody of [Child] appear to arise just as much from a desire to stamp out

_____

[11] Appellant admitted that she did not have a good relationship with her father, Child's maternal great-grandfather, but stated that she would permit him to see Child, if granted custody. N.T., 8/20/21, at 39. Appellant however did not reach out to Appellees to see Child when in Pennsylvania for the August 2021 hearing as Appellant did not want to see her father whom she was told was with Appellees. *Id.* at 35; *see also* N.T., 2/11/22, at 22.

- 14 -

any further influence her Pennsylvania relatives may have on [Child] as they do a desire to raise [Child] herself.[12] This causes her to discount [Appellees'] judgment with respect to raising [Child], as shown by the parties' testimony. Subjectively, Lindy credibly testified that [Appellant] has been critical and dismissive of [Appellees'] actions with respect to [Child]'s medical care, even accounting for Lindy's (at times) defensive posture toward [Appellant]. Objectively, [Appellant]'s view of how [Appellees] have performed as [Child]'s caregivers is insupportably negative.

The ultimate concern here is not so much that [Appellant], if given custody, would cut off all contact between [Child] and [Appellees], but rather that she would seek to limit it to only a nominal degree, and would not encourage contact beyond that which might be ordered by this [c]ourt.[13] This stands in stark contrast to Lindy's testimony, which revealed that [Appellees] will seek to maintain a relationship between [Child] and [Appellant], and that [Lindy] has the potential to become more open and relaxed in communications with [Appellant] as Lindy gets to know her better.

The above also factors into the [c]ourt's finding that shared custody is not possible at this time. While [Appellees] appear open to the possibility of co-parenting [Child] (including being receptive to concerns that [Appellant] has raised regarding [Child]'s medical care), that possibility is not reciprocated by [Appellant].

\* \* \*

_____

[12] When questioned why she wants custody of Child, Appellant responded, "Because [Mother] ended up with some pretty severe problems just from the years — few years she was [in Pennsylvania] and I would like to — I'd like to keep [Child] from having those kinds of issues as well." N.T., 8/20/21, at 29.

[13] In discussing her willingness to maintain family relationships, Appellant stated, "That doesn't mean that I have to have constant contact with her. There's other ways to keep a relationship than to have constant contact. I don't know what kind of contact you expect[,] but people are allowed to live their lives." N.T., 8/20/21, at 35. Appellant confirmed that she would send photos and information. _Id._ at 27. She further explained that she would "send on the school cards, Christmas cards . . . the same things [her] parents did when [she] was younger." _Id._ at 42. When asked, she then acknowledged she would do video calls, if requested. _Id._

4. <u>The need for stability and continuity in the child's education, family life and community life.</u>  The [c]ourt's initial finding was that this factor is neutral, given that both sides can give [Child] a stable, secure home.  However, on further consideration, the [c]ourt finds that this factor weighs in favor of [Appellees]. [Appellant] is certainly capable of providing [Child] with a stable and secure home, and at his young age, he has not formed strong community attachments yet.  However, community and education includes [Child]'s specialized medical and developmental needs. The [c]ourt finds that [Child] is in good hands in this regard, and does not believe that a wholesale shift in both service providers and treatment plans would be in his best interest at this time.

*    *    *

11. <u>The proximity of the residences of the parties</u>.  This is a key factor with respect to the possibility of both shared custody and regular visitation.  The distance between the residences and the limited resources available for travel simply do not allow for a shared custody arrangement or regular in-person visitation.

*    *    *

13. <u>The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.</u>  At the [February 11th hearing,] the [c]ourt generally found that this factor was neutral, but noted that it had admonished Lindy during part of her testimony when it began to veer into portraying [Appellant] in a poor light.[14]  Upon further review, this factor weighs in favor of [Appellees], and against [Appellant].  At [that

_____

[14] Lindy was admonished by the trial court for speaking negatively of Appellant.  The court stated:

> Ma'am, I'm going to stop you.  I'm just going to tell you. [Appellant] hasn't done anything wrong in my analysis in this case because she didn't message you on one time.  Your frustration or — you continue to attempt to shed a negative light on [Appellant].  She hasn't done anything wrong in the situation.  This is a tough situation. . . .

N.T., 2/11/22, at 47.

h]earing the [c]ourt focused on the issue of conflict, but did not address the willingness and ability of the parties to cooperate with one another. Based on the analysis set forth for the first factor, *supra*, the [c]ourt is much more concerned about [Appellant]'s willingness to cooperate with [Appellees] than it is [Appellees'] willingness to cooperate with [Appellant]. This will hopefully change with time as [Child] grows older.

* * *

16. <u>Any other relevant factor</u>. The [c]ourt noted two additional factors at the [s]econd [h]earing.

The first is that Lindy has a criminal conviction. On September 27, 2018, she pleaded guilty to one count of receiving stolen property, graded as a misdemeanor of the first degree, and was sentenced to five years' probation. However, this conviction is relevant only as a consideration with respect to the truthfulness of Lindy's testimony. Even if it were not, it is not the sort of offense that automatically raises concerns with respect to childrearing. On the whole, the [c]ourt believes that this factor is neutral in light of the significant evidence presented with respect to the quality of care and the quality of the home environment provided by [Appellees] for [Child].

The second is that [Appellant] objectively had a closer relationship with [Mother] over the years than Lindy did, given her involvement in [Mother]'s life when she was younger.[15] Upon further review and consideration, the [c]ourt finds that this factor actually weighs in favor of Lindy, and against [Appellant]. Specifically, while [Appellant] knew [Mother] starting when [Mother] was young, their relationship was strongest when [Mother] was younger, and waned as [Mother] grew older. While [Mother] did stay in touch with [Appellant] after she moved to Pennsylvania, the testimony established that this was more social, and [Mother] did not rely on her as a resource. Conversely, while [Mother] did not know Lindy while she was younger, she stayed in touch with Lindy regularly after visiting her in 2018, and she

---

[15] Appellant testified that she and Mother had a "good relationship." N.T., 8/20/21, at 16; **see also** Intervenor Exhibit 1. Discussing Mother's younger years, Appellant stated that Mother "looked up to me. [Mother] and I were close." **Id.** at 9.

reached out to Lindy for advice when she became pregnant with [Child].

There is a third, additional factor here that the [c]ourt did not discuss at the [s]econd [h]earing, but which does bear consideration. Respectfully, the [c]ourt has reservations with respect to [Appellant]'s willingness and ability to persevere in the face of the reasonably anticipatable difficulties and struggles that whomever has custody of [Child] will face as he grows older.

When [Mother] first came to live with [her grandparents] in Washington, [Appellant] took no significant action to help [Mother] despite her belief that [her father] was emotionally abusive.

\* \* \*

Much later, when [Mother] turned eighteen, [Appellant] declined to take custody of her from the girls' home in Colorado, despite having been contacted by the home and knowing that there were no other good options for [Mother].

A few months later, [Appellant] changed her mind, reached out to [Mother] in Texas, and sent [Mother] a bus ticket to come to Washington. However, that help was conditional, because as soon as it became clear that [Mother] was not doing exactly as [Appellant] wanted her to do, [Appellant] confronted her about it and [Mother] moved to Pennsylvania (i.e., the help was only on [Appellant]'s terms).

\* \* \*

The [c]ourt fully acknowledges the all too common reality of family members having to make the hard decision not to help a relative because they lack the resources or capacity to do so. It is also aware of the unrealistic and unhealthy societal trope that in order to be a "real" mother figure a woman must sacrifice anything and everything for the benefit of a child. Thus, the [c]ourt does not hold it against [Appellant] that she did not forgo a career and college in order to raise [Mother] when she was younger, or turn her life upside down to have [Mother] come live with her when she received a phone call out of the blue from the girls' home in Colorado. That said, though, [Appellant]'s statements regarding these actions are telling, because they show a pattern of refusal to compromise and insistence that things occur only according to her plans. Such behavior is not conducive

to successful parenting, because nothing about raising a child ever goes according to plan. The risk here is that [Appellant] would take primary custody of [Child] now, but then not be able to continue to care for him at a later time due to being overwhelmed by the constant adjustments needed, resulting in [Child] not having the stable home environment that he so desperately needs. This factor thus weighs against [Appellant].

Trial Ct. Op. at 12-24 (footnotes and record citations omitted).

As to Section 5328(a)(1) — which party is more likely to encourage and permit frequent and continuing contact between the child and another party — Appellant asserts that the court's conclusion that she is less likely to encourage contact belies the evidence. Appellant's Brief at 12-13. She dismisses her strained relationship with her father (Child's great-grandfather) and insists that, regardless, she would maintain Child's contact with him as well as his Pennsylvania family. *Id.* at 13-14. She further contends that any contact with Appellees questioning Child's medical care, in particular relating to medication, was "unfairly characterized . . . as indicative of distrust and criticism,"[16] and dismisses Appellees' negative reaction, which Appellant explains as "defensive and overly sensitive."[17]  *Id.* at 15-16.  Moreover,

_____

[16] Rather, Appellant avers that her concern "should . . . be lauded as an example of Appellant looking out for the best interests of the child." Appellant's Brief at 15.

[17] We observe that Appellant references text messages between herself and Appellees which she included as part of the Reproduced Record. *Id.* at 14-15. While admitted as part of Plaintiff's Exhibit 1, that which is included by Appellant in the Reproduced Record appears to be more expansive than that included with Exhibit P-1 in the certified record. We therefore do not consider the messages beyond what is included in Exhibit P-1 in certified record and any testimony related thereto. *See Commonwealth v. Preston*, 904 A.2d
*(Footnote Continued Next Page)*

Appellant argues that the court's ultimate conclusion that she would limit contact to a nominal amount is unsupported in the record, stating, "At no point did Appellant even imply that she would not be open to or seek to limit contact of any kind between [Child] and his Pennsylvania family." *Id.* at 16.  Appellant further references how she would preserve such contact, when asked.  *Id.*

Next, as to Section 5328(a)(4) — the need for stability and continuity in the child's education, family life, and community life — Appellant argues that the evidence supports that she is prepared to manage Child's medical and developmental needs.  *Id.* at 17-18.  While the court focused on a "wholesale shift" in service providers and treatment plans, Appellant asserts that a change in treatment plans is not necessarily the case.  *Id.* at 18.  Moreover, to the extent there would be a change in treatment plan, Appellant suggests that this is perhaps in Child's best interests as one of the potential providers is nationally ranked.  *Id.* at 18-19.

As to Section 5328(a)(11) — the proximity of the residences of the parties — Appellant argues that "this factor is not determinative in granting sole physical and legal custody to one of the parties over the other."  *Id.* at 19.  She contends that she should not be prejudiced by virtue of her residence in Washington.  *Id.*

---

1, 6 (Pa. Super. 2006) (*en banc*) (noting that an appellate may only consider that which is in the certified record).

Next, as to Section 5328(a)(13) — the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another — Appellant notes the trial court's reliance on Section 5328(1) and the parties' ability to cooperate with one another. *Id.* at 19. Appellant emphasizes Appellees' disdain for her, which is excused as frustration that Appellant was not "keeping up" more and not initiating more contact. *Id.* at 20-22. Appellant however notes Child's young age and his inability to interact other than in-person. *Id.* at 22. She further argues that the evidence suggests that she was in fact "keeping up" with Child. *Id.* Moreover, Appellant contends that the evidence contains an actual example of Appellees non-cooperation with respect to a lack of communication as to Child's first birthday party. *Id.* at 23-24. Appellant states:

> The record reflects an actual instance of [Lindy]'s unwillingness to cooperate with Appellant. The record is void of any actual instance of Appellant's unwillingness to cooperate with [Lindy]. The [t]rial [c]ourt weighed this factor in [Appellees'] favor based on inferences derived from Appellant's testimony regarding her relationship with her father, while failing to properly consider the actual, admitted instance of [Lindy]'s unwillingness to cooperate with Appellant. Appellant at no point testified or inferred a criticism or castigation of Appellees. [Lindy] repeatedly attempted to paint a negative picture of Appellant. It was never placed on the record that Appellant would refuse or had refused to cooperate with [Lindy]. It was placed on the record that [Lindy] actually refused in at least one instance not to cooperate with Appellant. Therefore, the record supports a conclusion that the thirteenth factor under § 5328(a) weighs in favor of Appellant, and against Appellee[s].

*Id.* at 24.

Finally, as to Section 5328(a)(16) — any other relevant factors — Appellant argues that the trial court's determinations regarding consanguinity and what it deemed as Appellant's inability to compromise were against the weight of the evidence and not supported by the record.[18]  **See** Appellant's Brief at 25-28, 30.

On the issue of consanguinity, Appellant argues, "The [t]rial [c]ourt's characterization of the relationship between [Mother] and [Lindy] stands in stark contrast with the reality of the testimonial record on the subject."  **Id.** at 31.  While Appellant concurs with the court's assessment as to a lack of a relationship between Mother and Lindy during Mother's early years, Appellant contends that the court incorrectly perceived a relationship involving continuous communication once Mother returned to Pennsylvania in her later years.  **Id.** at 31-32.  Further, Appellant emphasizes her own participation in Mother's life.  Appellant asserts that "the record is clear that [she] was not only an active figure in [Mother]'s life during [Mother]'s younger years, but had significantly more contact with [Mother] than [Lindy] toward the end of [Mother]'s life." **Id.** at 32.  As such, Appellant concludes that "it is clear that Appellant's relationship with [Mother] . . . is an extremely significant factor weighing heavily in Appellant's favor."  **Id.** at 33.

_____

[18] Appellant agrees with the court that Lindy's criminal conviction for receiving stolen is essentially a non-issue.  Appellant's Brief at 25.

Additionally, although the court expressed "reservations with respect to [Appellant's] willingness and ability to persevere in the face of the reasonably anticipatable difficulties and struggles," Appellant argues that her actions with respect to Mother do not suggest an unwillingness to compromise. *Id.* at 25-26 (record citation omitted). In particular, Appellant asserts that her past behaviors as stated are not "indicative of . . . a pattern [of] refusal to compromise." *Id.* at 26. Referencing Mother's week with her in Washington and subsequent move to Pennsylvania, Appellant indicates that the move to Pennsylvania was Mother's choice, of which she was supportive. *Id.* at 26-28. Moreover, Appellant states:

> To the extent Appellant's testimony raises any reasonable concern with regard to her ability to adjust as needed, Appellant's objectively stable household at this point in her life, as well as her status as a homemaker and her credible testimony regarding her preparedness to handle the child's specialized medical needs, undercuts those concerns. There is no reasonable basis for the conclusion that Appellant would be incapable of making necessary adjustments as they arise. Therefore, there was no basis for the [t]rial [c]ourt to weigh this additional factor against Appellant.

*Id.* at 28.

As we construe Appellant's challenge, the issue at its core is a dispute concerning the trial court's findings of fact and determinations regarding credibility and weight of the evidence, as well as the weight attributed to certain factors. Appellant, in essence, questions the trial court's conclusions and assessments and seeks for this court to re-find facts, re-weigh evidence, and/or re-assess credibility to her view of the evidence. This we cannot do.

Under the aforementioned standard of review applicable in custody matters, the trial court's findings of fact and determinations regarding credibility and weight of the evidence are not disturbed absent an abuse of discretion. **See C.R.F.**, 45 A.3d at 443; **see also E.R.**, 129 A.3d at 527. As we stated in **King v. King**, 889 A.2d 630, 632 (Pa. Super. 2005), "It is not this Court's function to determine whether the trial court reached the right decision; rather, we must consider whether, based on the evidence presented, given due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion[.]" (citation and quotation marks omitted). After a thorough review of the record, we find no abuse of discretion. To the extent Appellant challenges the weight attributed to any factor by the trial court, we likewise find no abuse of discretion. As stated above, the amount of weight that a trial court gives to any one factor is almost entirely within its discretion. **See M.J.M.**, 63 A.3d at 339.

In the case *sub judice*, the trial court carefully considered each of the Section 5328(a) factors. **See** Trial Ct. Op. at 12-24. After review of the record, we conclude the trial court's factual findings are supported by the evidence, and the weight it assigned to each factor is reasonable in light of those findings. As such, we do not disturb them. Appellant's first and third claims are therefore without merit.

Turning to Appellant's second and fourth issues on appeal,[19] Appellant argues that the trial court abused its discretion in awarding her only two visits per year with no overnight visitation. Appellant's Brief at 34-36. Appellant contends that this limited amount of partial physical custody, without a provision for the potential of additional custodial time if agreed upon by the parties, was not justified or supported by the record. *Id.* at 34-35. Identifying travel expenses as the basis for the court's limited award of partial physical custody, Appellant asserts that the record fails to support the court's contention that the parties cannot afford more frequent travel. *Id.* Appellant maintains that "she should be entitled to more visitation with the child and that the limitation set forth by the [t]rial [c]ourt is an arbitrary one, with no justification on the record." *Id.* at 35.

Moreover, Appellant further opposes the lack of overnight custodial time. *Id.* at 35-36. Recognizing the emphasis on Child's age and medical needs, Appellant maintains that the custodial schedule "was not carefully tailored to meet the needs of all parties involved" and "does very little in the way of facilitating a healthy and continuing relationship between Appellant and [Child]." *Id.*

---

[19] Appellant states in the argument section of her brief that her second issue is "part and parcel" of her fourth issue. Appellant's Brief at 29. Thus, we address these claims together.

In support of its physical custody award, the trial court emphasized the distance between the parties and the time and expense of travel, as well as the age and medical conditions of Child. **See** Trial Ct. Op. at 28. The court further expressed its hope for more expansive partial physical custody in the future. **Id.** The court opined:

> This is not the typical case where the parties live within a thirty or forty-five minute drive of each other, and thus travel back and forth may be inconvenient, but is not unrealistic. The distance between [Appellant]'s home in Washington and [Appellees'] home in Pennsylvania is approximately 2,600 miles. Travel by air is, for all intents and purposes, a full-day endeavor. Travel by car is unrealistic for anything less than a long-term visit; the same considerations apply to travel by bus or train. Regardless of method, the expense is significant — likely at least $1,000 per trip for one person, one way. Neither household has the financial resources to enable such travel to occur regularly. And this is to say nothing of the fact that, due to his young age and medical issues, it would be inadvisable to attempt such long-distance travel with [Child]. The imposition of a more regular in-person visitation schedule would thus be both unrealistic and place an undue burden on the parties.
>
> The [c]ourt hopes that this situation changes for the better in the future, and is certainly open to a more active visitation schedule, should it become a possibility.

**Id.** (footnotes omitted).

Further, as to the lack of overnight partial physical custody, the court reasoned similarly, stating:

> The [c]ourt notes that this is a baseline, and the custody order both leaves open and encourages the possibility of regular telephone and video calls between the parties, so that [Appellant] can both see and interact with [Child]. The frequency of such visits is governed by the distance and expense considerations discussed . . . above. The duration must necessarily be limited to daytime only (i.e., no overnights) due to the young age of [Child],

- 26 -

his special medical needs, and the fact that [Appellant] is essentially a stranger to him. As he grows older and gets to know [Appellant], this will change, and overnight visits may become a possibility.

*Id.* at 29.

With this, we are constrained to agree. As indicated ***supra***, the trial court analyzed and addressed each factor as required by Section 5328(a) in establishing its custody order, including Appellant's custodial time. ***See*** Trial Ct. Op. at 12-24. We conclude the court thoroughly considered Child's best interests, and the evidence supports the court's custody decision. We acknowledge the unique circumstances of this matter, and, as noted by the trial court, such custodial time is subject to change and expansion in the future. ***See*** 23 Pa.C.S. § 5338(a) ("Upon petition, a court may modify a custody order to serve the best interest of the child."). As such, Appellant's claims are without merit.

For the foregoing reasons, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/29/2022

- 27 -